UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SHAUN ROBERTS, et al.,<br><br>           Plaintiffs,<br><br>  vs.<br><br>OBELISK, INC., a Delaware corporation, et al.,<br><br>           Defendants. | CASE NO. 18cv2898-LAB (BGS)<br><br>**ORDER DENYING INDIVIDUAL DEFENDANTS' MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION [Dkt. 9];**<br><br>**ORDER GRANTING DEFENDANTS' MOTION TO COMPEL ARBITRATION [Dkt. 3, 9]** |

  Plaintiffs Shaun Roberts, Nicholas Colley, and Allan Henry, individually and on behalf of a putative class, brought this suit in November 2018, alleging that Defendant Obelisk, Inc., its parent company Nebulous, Inc. (together, the "Corporate Defendants"), and two of its officers, David Vorick and Zach Herbert (together, the "Individual Defendants"), violated California and Massachusetts law in marketing and selling cryptocurrency miners. Presently before the Court are two motions. First, the Individual Defendants move to dismiss the case against them for lack of personal jurisdiction. Second, the Corporate Defendants move to compel the Plaintiffs to arbitration. The Individual Defendants join in this motion to compel arbitration to the extent their jurisdictional challenge is denied. As discussed below, the Court finds that it has personal jurisdiction over the Individual Defendants but that all of Plaintiffs' claims are subject to arbitration.

## BACKGROUND

**1. Plaintiffs' Pre-Orders**

Defendant Obelisk manufactures and sells cryptocurrency miners—specialized computers designed to solve complex mathematical problems known as cryptographic hash functions. *See* Compl., Dkt. 1-2, at ¶ 2-3. Through solving these functions, a miner's owner can earn digital cryptocurrency that can be exchanged for actual goods and services. Defendant Nebulous is Obelisk's parent company, and Defendants David Vorick and Zach Herbert are the two companies' CEO and Vice President, respectively. *Id.* at ¶¶ 12-15.

Obelisk operates a website—https://obelisk.tech/—that allows users to purchase the cryptocurrency mining hardware it designs and manufactures. At the times relevant to this suit, Obelisk offered pre-orders for two types of miner, the SC1 and the DCR1. Because the miners boasted high "hash rates," individuals involved in the cryptocurrency mining industry (including the Plaintiffs) believed these units would be more profitable than existing miners. *Id.* at ¶¶ 24-25. Between November 2017 and January 2018, the three plaintiffs—Shaun Roberts, Nicholas Colley, and Allan Henry—each visited Obelisk's site to pre-order a miner: Roberts purchased two DCR1 miners on November 23, 2017; Colley purchased one SC1 miner on September 5, 2017 and two DCR1 miners on January 31, 2018; Henry ordered 16 DCR1 miners and 8 SC1 miners on November 23, 2017 and later purchased 17 SC1 miners and 9 DCR1 miners on January 31, 2018. *Id.* at ¶¶ 9-11. In their marketing campaign, primarily conducted on internet sites like Reddit, Twitter, and Discord, Obelisk assured customers that they would be eligible for a refund if Obelisk did not ship miners meeting the advertised specifications by June 2018. *Id.* at ¶ 30. When June rolled around, however, the first shipped miners did not meet the advertised specifications. *Id.* at ¶ 52. To make matters worse, Obelisk did not finish shipping the first batch of miners until October 2018, nearly four months after the promised date. *Id.* at ¶ 58. Plaintiffs demanded a refund, but Obelisk refused. Plaintiffs then brought this suit in California state court on behalf of a putative class of individuals who pre-ordered cryptocurrency miners from Obelisk. Specifically, Plaintiffs allege that Defendants' marketing and sale of the miners violated the

securities and unfair competition laws of both California and Massachusetts.[1] *See generally* Compl., Dkt. 1-2. Obelisk timely removed the suit to this Court. *See* Dkt. 1.

**2.      The Arbitration Agreement**

To complete a pre-order on Obelisk's website, the purchaser is required to check a box indicating that he or she "agree[s] to the Terms and Conditions and acknowledge[s] the Privacy Policy." *See* Herbert Decl., Dkt. 3-2, at ¶ 6; Ex. 1. The phrases "Terms and Conditions" and "Privacy Policy" are in red hyperlinked letters, which contrasts with the grey lettering elsewhere on the page. When clicked, the "Terms and Conditions" hyperlink redirects the purchaser to a document entitled "Pre-Order Terms & Conditions," which contains the various terms of the sale and notes that "BY CLICKING 'I AGREE' YOU REPRESENT THAT YOU AGREE TO BE BOUND BY THE TERMS OF THIS AGREEMENT AND THAT YOU HAVE THE AUTHORITY TO ACT ON BEHALF OF THE BUYER." *Id.* at Ex. 5.

Although the terms in the agreement varied depending on the specific miner being ordered, each set of terms contained an identical arbitration provision. *See id.* Ex. 5 at ¶ 18; Ex. 6 at ¶ 19; Ex. 7 at ¶ 19; Ex. 8 at ¶ 19; Ex. 9 at ¶ 19. That provision begins: "Please read the following arbitration agreement in this Section ("Arbitration Agreement") carefully. It requires you to arbitrate disputes with Obelisk and limits the manner in which you can seek relief from us." *See, e.g., id.*, Ex. 5 at ¶ 18. It goes on to say:

> You agree that any dispute or claim relating in any way to your Pre-Order or this Agreement, will be resolved by binding arbitration, rather than in court, except that (1) you may assert claims in small claims court if your claims qualify, so long as the matter remains in such court and advances only on an individual (non-class, non-representative) basis; and (2) you or Obelisk may seek equitable relief in court for infringement or other misuse of intellectual property rights (such as trademarks, trade dress, domain names, trade secrets, copyrights, and patents).

*See, e.g., id.*, Ex. 5 at ¶ 18.a. The Arbitration Agreement contains a delegation clause:

---

[1] Nebulous and Obelisk are each Delaware corporations with its principal place of business in Massachusetts.

> The arbitrator, and not any federal, state or local court or agency will have exclusive authority to resolve any dispute related to the interpretation, applicability, enforceability or formation of this Arbitration Agreement including, but not limited to any claim that all or any part of this Arbitration Agreement is void or voidable. The arbitration will decide the rights and liabilities, if any, of you and Obelisk.

*See, e.g., id.*, Ex. 5 at ¶ 18.c. The Arbitration Agreement requires arbitration on an individual basis:

> <u>Waiver of Class of Consolidated Actions</u>. ALL CLAIMS AND DISPUTES WITHIN THE SCOPE OF THIS ARBITRATION AGREEMENT MUST BE ARBITRATED ON AN INDIVIDUAL BASIS AND NOT ON A CLASS BASIS, ONLY INDIVIDUAL RELIEF IS AVAILABLE, AND CLAIMS OF MORE THAN ONE CUSTOMER CANNOT BE ARBITRATED OR CONSOLIDATED WITH THOSE OF ANY OTHER CUSTOMER.

*See, e.g., id.*, Ex. 5 at ¶ 18.e (capitalization in original). Anyone pre-ordering a miner from Obelisk was required to check the box indicating that they agreed to the terms (including the arbitration provision) before they could complete their transaction, and Obelisk has provided the Terms and Conditions corresponding to each Plaintiff's purchase. *See* Herbert Decl. at ¶ 10 (Roberts), ¶ 11 (Colley), ¶¶ 12-13 (Henry); *see also* Herbert Decl, Ex. 5-9 (full agreements).

## DISCUSSION

Defendants bring two motions. First, the Individual Defendants move to dismiss the case against them for lack of personal jurisdiction. Second, the Corporate Defendants move to compel arbitration based on the pre-order Terms and Conditions. The Individual Defendants join in this motion to compel arbitration to the extent their jurisdictional challenge is denied.

**1.      Individual Defendants' Motion to Dismiss for Lack of Personal Jurisdiction**

The two Individual Defendants, Zach Herbert and David Vorick, move to dismiss the case for lack of personal jurisdiction, arguing that their contacts with the state of California are insufficient to permit this Court to exercise jurisdiction over them. The Court disagrees.

When a defendant moves to dismiss for lack of personal jurisdiction, the burden of proving personal jurisdiction rests with the plaintiff. *Pebble Beach Co. v. Caddy*, 453 F.3d 1151, 1154 (9th Cir. 2006). Personal jurisdiction over each defendant must be assessed individually. *Calder v. Jones*, 465 U.S. 783, 784 (1984). Courts may not assume the truth of allegations in a pleading when those allegations are contradicted by affidavit. *Data Disc, Inc. v. Systems Technology Associates, Inc.*, 557 F.2d 1280, 1284 (9th Cir. 1977).

Specific personal jurisdiction[2] in the Ninth Circuit is analyzed through a three-prong test. *See Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 802 (9th Cir. 2004). The first prong requires that the defendant have purposefully directed his activities at the forum state or purposefully availed himself of the benefits of the forum state. *Id.* The second prong requires that the plaintiff's claim arise out of the defendant's forum-related activity. *Id.* The third prong requires that the exercise of personal jurisdiction be reasonable. *Id.* The first prong must follow an effects test, under which the defendant must commit an intentional act, the act must be expressly aimed at the forum state, and the act must cause harm that the defendant knows is likely to be suffered in the forum state. *See Dole Food Co., Inc. v. Watts*, 303 F.3d 1104, 1111 (9th Cir. 2002). The second prong must satisfy a "but for" causation test. *Bancroft & Masters, Inc. v. Augusta Nat. Inc.*, 223 F.3d 1082, 1088 (9th Cir. 2000).

A defendant's status as an employee or officer of a corporation does not shield them from liability for intentionally tortious acts. *Calder*, 465 U.S. at 790. However, mere association with a corporation that causes injury is not sufficient to permit personal jurisdiction without a further reason for the court to disregard the corporate form. *Davis v. Metro Productions, Inc.*, 885 F.2d 515, 520 (9th Cir. 1989).

### a. Purposeful Direction/Availment

To demonstrate that specific personal jurisdiction is appropriate, a plaintiff must first show that the defendant purposefully directed his actions at the forum state or purposefully

---

[2] Plaintiffs do not contend that the Court has general personal jurisdiction over the Individual Defendants, so the Court limits its analysis to specific personal jurisdiction.

availed himself of the privilege of doing business there. Plaintiffs here point three "types" of contacts by the Individual Defendants that were directed at California in the months leading up to Plaintiffs' pre-orders. First, Plaintiffs point to Herbert and Vorick's extensive marketing efforts on behalf of the Corporate Defendants. In the run-up to the pre-sale, for example, Herbert and Vorick regularly posted on internet sites about the hash rates of the miners and the refund policies that would apply if the miners were not shipped on time. *See* Compl. at ¶¶ 24-32. Defendant Vorick also spoke at cryptocurrency conferences in California on at least three occasions: in June 2016, October 2017, and August 2018. *See* Taylor-Copeland Decl., Dkt. 14-2, at ¶¶ 3-5. Second, Plaintiffs allege that the Individual Defendants "sold" miners to "numerous investors located in California, thereby accessing California's capital markets." Opp. at 7. Third, the Individual Defendants "operated an interactive website obelisk.tech" that allowed individuals in California to purchase miners. *Id.* at 8.

The second and third contacts put forward by Plaintiffs cannot constitute purposeful direction or availment by the Individual Defendants because these actions—selling miners and operating an interactive website—were undertaken by the companies that employed them, not the Individual Defendants themselves. To be sure, a corporate officer cannot evade jurisdiction for a tort they commit simply because they were acting in their official capacity when they committed it. *See Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.*, 173 F.3d 725, 734 (9th Cir. 1999) ("A corporate officer or director is, in general, personally liable for all torts which he authorizes or directs or in which he participates, notwithstanding that he acted as an agent of the corporation and not on his own behalf."). But it is nonetheless true that the officer's "contacts with California are not to be judged according to their employer's activities there." *Calder*, 465 U.S. at 790. The website here was operated not by Herbert or Vorick, but by the companies that employed them, Obelisk and Nebulous. Although a corporation has no ability to act on its own—it must rely on its agents, including its officers, to act—absent a showing of a special connection between the officer and the specific corporate acts at issue, the officer is no more subject to personal jurisdiction for a company's online sale than the IT Administrator who manages the company's website.

1 Sales of the miners (through the website or otherwise) may give rise to jurisdiction over the company itself, but there is no reason that the sales would give rise to jurisdiction over the company's officers.[3]

Whether the Individual Defendants' marketing efforts on behalf of Obelisk gives rise to personal jurisdiction over them is a closer call. The Individual Defendants, relying on *Colt Studio, Inc. v. Badpuppy Enter.*, 75 F. Supp. 2d 1104 (C.D. Cal. 1999), argue that these marketing efforts were undertaken on behalf of the company and therefore cannot give rise to jurisdiction over the officers individually. *See id.* at 1111 ("For jurisdictional purposes, the acts of corporate officers and directors in their official capacities are the acts of the corporation exclusively and are thus not material for purposes of establishing minimum contacts as to the individuals."). *Colt Studio*'s holding, however, has been called into question by subsequent decisions. *See Slaughter v. Van Cleve*, 2007 WL 4357567, at *8 n.3 (C.D. Cal. 2007) (discussing the developments since the *Colt Studio* decision). Indeed, Ninth Circuit decisions both pre- and post-*Colt Studios* are flatly inconsistent with that case's holding. *See, e.g., Davis,* 885 F.2d at 522 (rejecting corporate officer defendants' arguments that they were protected from jurisdiction by a fiduciary shield; the correct jurisdictional inquiry analyzed the contacts of each defendant with the forum state); *Facebook, Inc. v. Power Ventures, Inc.*, 844 F.3d 1058, 1069-70 (9th Cir. 2016) (finding personal jurisdiction over a corporate officer proper where the officer was the "guiding spirit and central figure" in the company's wrongful conduct). Consistent with these decisions, the Court finds that the Individual Defendants cannot take advantage of the so-called "fiduciary-shield doctrine" if their contacts with California would otherwise give rise to jurisdiction.

The first type of alleged marketing effort—Vorick's attendance at trade shows and conferences in California—clearly constitutes purposeful direction. Vorick gave speeches while physically present in California. These were "intentional act[s]" that were "expressly

---

[3] The same is true of two other generic contacts Plaintiffs allege: Obelisk's testing of chips in California and its processing of payments through a La Jolla-based bank. *See* Opposition at 4-5. Neither Individual Defendant has any specific relation to these actions.

- 7 -

aimed at the forum state." *Pebble Beach Co.*, 453 F.3d at 1156. Further, Vorick should have expected that the "brunt" of any harm from those speeches would fall disproportionately on California residents, who likely made up the bulk of attendees at the conferences. *Id.*

The second type of alleged marketing effort—Vorick's and Herbert's posts on internet sites—likewise constitutes purposeful direction. Plaintiffs allege that "Defendants utilized Reddit, Twitter, and Discord—services based in California—to make these misrepresentations to California residents." For years, the Ninth Circuit has "struggled with the question of whether tortious conduct on a nationally accessible website is expressly aimed at any, or all, of the forums in which the website can be viewed." *Mavrix Photo, Inc. v. Brand Techs., Inc.*, 647 F.3d 1218, 1229 (9th Cir. 2011). Although the issue is far from settled, at least one clear rule emerges: a defendant is subject to personal jurisdiction if he or she makes tortious statement on a website and combines that statement with "other conduct directly targeting the forum." *Id.* (quoting *Rio Props., Inc. v. Rio Int'l Interlink*, 284 F.3d 1007, 1020 (9th Cir. 2002)). What constitutes "other conduct targeting the forum" is intentionally left vague; it may include the interactivity of the website at issue, the geographic scope of defendant's commercial ambitions, or whether defendant individually targeted a plaintiff known to be a forum resident. *Id.* (citing cases). Considering the various connections between the Individual Defendants and the California market at large—the speeches given in California, the direct email contacts with California purchasers, and the "size and commercial value of the California market"—the Court concludes that there is enough "other conduct directly targeting the forum" that the Individual Defendants' internet posts constitute purposeful direction. *Id.* at 1229-30.

      **b.**    **Relation of Contacts to Plaintiffs' Claims**

But whether a defendant purposefully directed his conduct at the forum state is irrelevant if the plaintiff's claims at issue do not arise from that same conduct. *See Mattel, Inc. v. Greiner & Hausser GmbH*, 354 F.3d 857, 864 (9th Cir. 2003). Defendants argue that Plaintiffs have not demonstrated a sufficient relationship between their claims and

Defendants' contacts with California. They point out, for example, that Plaintiffs fail to allege they attended any of Vorick's trade show presentations within the state, and that one of the talks occurred in August 2018, after they placed their orders. While it may be true that the Vorick's California speeches were not a "but for" cause of Plaintiffs' investment, the same cannot be said for the Individual Defendants' online misrepresentations. *Harris Rutsky*, 328 F.3d at 1131–32. Plaintiffs' Complaint explains at length the various statements Vorick and Herbert made online regarding the miners' anticipated hash rates and the refund policy if the miners were not shipped on time. *See* Compl. at ¶¶ 24-31. They further allege that they relied on these statements when they made the decision to purchase a miner. *Id.* at ¶¶ 3-5. These misrepresentations were a "but for" cause of Plaintiffs' injuries.

In short, the Court concludes that the Individual Defendants purposefully directed at least some of their conduct at California and that this conduct is related to Plaintiffs' claims. It also finds that the exercise of jurisdiction would be reasonable. The Court has personal jurisdiction over the Individual Defendants, so their Motion to Dismiss for Lack of Personal Jurisdiction is **DENIED**.

**2. Defendants' Motion to Compel Arbitration**

Based on the language of the arbitration provision in Obelisk's pre-order Terms and Conditions, Obelisk argues that Plaintiffs are compelled to arbitrate this dispute rather than pursue it in Court. The remaining defendants, both Corporate and Individual, submit that Plaintiffs' claims against them must also be arbitrated under the doctrine of equitable estoppel. The Court agrees on both fronts.

The Federal Arbitration Act ("FAA"), 9 U.S.C. § 1, *et seq.*, reflects a strong public policy in favor of arbitration. The FAA applies to any "contract evidencing a transaction involving commerce," and provides that any arbitration agreement within its scope "shall be valid, irrevocable and enforceable." 9 U.S.C. § 2. "A party aggrieved by the alleged . . . refusal of another to arbitrate" may petition any federal district court for an order compelling arbitration. *Id.* at § 4. Congress enacted the FAA to overcome "widespread judicial hostility to arbitration agreements," and to ensure that courts enforce valid agreements to arbitrate.

*See AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011). "The FAA 'leaves no place for the exercise of discretion by a district court, but instead mandates that district courts *shall* direct the parties to proceed to arbitration'" if it concludes the parties have agreed to arbitrate the dispute. *Kilgore v. KeyBank Nat'l Ass'n*, 673 F.3d 947, 955 (9th Cir. 2012) (quoting *Dean Witter Reynolds Inc. v. Byrd*, 470 U.S. 213, 218 (1985) (emphasis in original)). "The court's role under the [FAA] is therefore limited to determining (1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue." *Kilgore*, 673 F.3d at 955 (citation omitted). If the answer to both questions is "yes," the court is required to enforce the arbitration agreement. *Id.*

Plaintiffs do not seriously dispute that the alleged arbitration agreement in Obelisk's Terms and Conditions, if valid, encompasses the claims at issue in this case. Rather, Plaintiffs contend that they never agreed to arbitrate their claims with Obelisk and that, even if they did, they did not agree to arbitrate with Nebulous, its parent company, or the Individual Defendants, its officers. The Court will take these arguments in turn.

### a. Plaintiffs Agreed to Arbitrate their Claims against Obelisk.

In determining whether parties have agreed to arbitrate, courts "apply ordinary state-law principles that govern the formation of contracts." *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995). Under Massachusetts law, which applies here[4], contracts formed via a "clickwrap" agreement—an Internet transaction in which a party must check a box indicating they agree to the applicable contract terms—are enforceable. *See Wickberg v. Lyft, Inc.*, 356 F. Supp. 3d 179, 183-84 (D. Mass. 2018) (collecting cases). Plaintiffs do not dispute that they pre-ordered miners on Obelisk's website. *See* Compl. at ¶ 62; Herbert Decl. at ¶ 10–13. When they did so, they agreed that "any dispute or claim relating in any

---

[4] The Terms and Conditions contain a choice-of-law provision designating Massachusetts law. Plaintiffs argue, just as they do with respect to the arbitration provision, that because they did not agree to the Terms and Conditions they are not bound by its choice-of-law provision. Because the Court finds that Plaintiffs agreed to the Terms and Conditions with respect to the arbitration provision, there's no basis for finding that they did not also agree to its choice-of-law provision. In any event, Plaintiffs concede that Massachusetts and California law are essentially in accord regarding contract formation in the context of arbitration, so this is largely a red herring. *See* Opp. at 9 n.3.

way to [their] Pre-Order or this Agreement" would be resolved by individual arbitration and not as part of a class action. Herbert Decl., Ex. 5 at ¶¶ 18.a, 18.e. Specifically, Plaintiffs indicated their assent to the arbitration agreement when they checked the box indicating that they agreed to Obelisk's Terms. This resulted in a binding and enforceable contract. *See Wickberg*, 356 F. Supp. 3d at 183-84 (compelling arbitration where plaintiff clicked a box to stating he agreed with terms, which were available at the bottom of the page through a pink hyperlink); *see also CR Assocs. L.P. v. Sparefoot, Inc.*, 2018 WL 988056, at *4 (D. Mass. 2018) ("Here, the availability of the terms of services were communicated to [plaintiff] by a blue hyperlink, and [plaintiff] manifested his assent to those terms by clicking 'I agree.' More was not required.") (internal citations omitted)).

Against this clear weight of case law, Plaintiffs make three primary arguments as to why the agreement shouldn't be enforced. First, Plaintiffs argue first that they had no notice of the arbitration provision because the terms weren't conspicuous. For example, they cite *Cullinane v. Uber Techs., Inc.*, 893 F.3d 53, 62 (1st Cir. 2018), for the proposition that "'conspicuous' means that a term[] is 'so written, displayed or presented that a reasonable person against which it is to operate ought to have noticed it.'" While apparently meant to suggest that the terms at issue here were not presented in such a way that a reasonable person would have noticed them, this citation omits the relevant part of that case. The opinion goes on to note that "Uber chose not to use a common method of conspicuously informing users of the existence and location of terms and conditions: *requiring users to click a box stating that they agree to a set of terms, often provided by hyperlink, before continuing to the next screen.*" *Id.* at 62 (emphasis added). In other words, the First Circuit specifically contrasted the defendant's practice in that case with the commonly accepted "conspicuous" practice of requiring users to check a box indicating they agree to the hyperlinked terms. That's exactly what Obelisk required Plaintiffs to do before pre-ordering a miner. Far from being an anomalous holding, Ninth Circuit cases support the same conclusion. *See Nguyen v. Barnes & Noble, Inc.*, 763 F.3d 1171, 1177 (9th Cir. 2014) ("Were there any evidence in the record that [plaintiff] was required to affirmatively

1  acknowledged the Terms of Use before completing his online purchase, the outcome of this
2  case might be different.").

3　　　　Plaintiff's related argument that the hyperlink was not conspicuous because it was in
4  pink rather than the customary blue does not hold water.  First, the argument that a hyperlink
5  must be a specific color was specifically rejected in *Wickberg*.  *See Wickberg*, 356 F. Supp.
6  3d at 184 ("[A]lthough . . . 'Lyft's terms of service' appeared towards the bottom in a smaller
7  font and without a typical blue-colored hyperlink, the phrase was pink and distinguishable
8  on the screen.").  The red text here was likewise distinguishable from the grey text found
9  elsewhere on the screen.  *See* Herbert Decl., Ex. 1.  Second, even if the text were more
10 difficult to distinguish than usual, by clicking a box indicating that they agreed to the terms,
11 a reasonable user be on notice that a hyperlink was likely somewhere in the adjacent text.
12 The Court finds that the text here was conspicuous.

13　　　　Plaintiff's second primary argument is that Obelisk has not provided an "executed"
14 version of the Terms and therefore cannot demonstrate that Plaintiffs assented to the
15 agreement.  *See* Opp. at 6-8.  Were the Court to accept this argument, it would unravel
16 nearly every clickwrap agreement on the Internet.  Obelisk has submitted evidence—a
17 declaration by its Vice President, Zach Herbert[5]—showing that Plaintiffs pre-ordered miners
18 on specific dates and that they were required to accept the Terms prior to completing that
19 transaction.  *See* Herbert Decl. at ¶¶ 6, 10-13.  Herbert also provided the exact Terms in
20 effect on the date each Plaintiff made his pre-order, and each set of terms contained an

---

[5] Plaintiffs object to this declaration, arguing that Herbert lacks personal knowledge regarding the website's layout at the time Plaintiffs purchased their miners.  By virtue of his position as Vice President, however, Herbert has demonstrated sufficient personal knowledge to testify as to the state of the website and to Plaintiffs' pre-orders.  *See Barthelemy v. Air Lines Pilots Ass'n*, 897 F.2d 999, 1018 (9th Cir. 1990) (A declarant's personal knowledge may be "inferred from their positions and the nature of their participation in the matters to which they swore.").  Plaintiffs' other objection regarding the "best evidence rule" also fails.  *See Stover-Davis v. Aetna Life Ins. Co.*, 2016 WL 2756848, at *3 (E.D. Cal. 2016) (finding a best evidence objection "inappropriate" in considering a motion to compel arbitration).  Plaintiffs' objections are **OVERRULED**.  Dkt. 4-4.

identical arbitration provision. *See id.* at ¶ 9.[6] That Plaintiffs "do not recall" agreeing to the terms is immaterial. *See Graf v. Match.com, LLC,* 2015 WL 4263957, at *4 (C.D. Cal. 2015) (rejecting allegations that plaintiff "did not agree to be bound by" the arbitration agreement and contrasting those allegations against "admissible evidence that all users during the relevant time period were required to affirmatively agree to the Terms of Use."); *see also Wickberg*, 356 F. Supp. 3d at 184 n.5 ("Wickberg also challenges the arbitration agreement on grounds that he does not remember, nor is there is any evidence of him, clicking the hyperlink to view the terms of service. However, the relevant inquiry is not whether he actually viewed the terms but whether they were reasonably communicated to him.").

Plaintiff's final challenge to the arbitration agreement is that its terms are illusory because Obelisk was allowed to "unilaterally modify the agreement at any time." Opp. at 12-13. There are several problems with this argument. First, it is immaterial because Obelisk did not change the terms of the arbitration provision after Plaintiffs accepted it. *See Melez v. Kaiser Found. Hosps., Inc.*, 2015 WL 898455, at *6 (C.D. Cal. 2015) (declining to find an arbitration agreement unenforceable where defendant "has never enforced the [modification] provision."). Second, even with the modification provision, Obelisk was still bound by the implied covenant of good faith a fair dealing. The implied covenant "limits the [defendant's] authority to unilaterally modify the arbitration agreement and saves that agreement from being illusory and thus unconscionable." *Serpa v. California Surety Investigations, Inc.,* 215 Cal. App. 4th 695, 706 (Cal. Ct. App. 2013); s*ee also Melez*, 2015 WL 898455, at *6 (declining to find an arbitration agreement unenforceable because the implied covenant made it non-illusory). Finally, challenges to the unconscionability of an arbitration agreement—including whether its terms are illusory—are questions for the

---

[6] Plaintiff Henry relatedly argues that because he purchased both the SC1 and DCR1 miner, he could not have agreed to both sets of terms. But as Herbert explains in his declaration, Henry was required to complete two separate transactions to purchase two different types of miner, and in each of those transactions he accepted the terms applicable to that type of miner. *See* Herbert Decl. at ¶ 4; Suppl. Herbert Decl., Dkt. 4-1, at ¶ 13.

- 13 -

arbitrator to decide in the first instance. *See Brennan v. Opus Bank*, 796 F.3d 1125, 1130-31 (9th Cir. 2015).

The Court concludes that Plaintiffs are compelling to individually arbitrate their claims against Obelisk.

### b. Plaintiffs are Compelled to Arbitrate their Claims against Nebulous and the Individual Defendants under the Doctrine of Equitable Estoppel.

Plaintiffs argue that even if they are compelled to arbitrate their claims against Obelisk, they have no obligation to arbitrate their claims against Nebulous and the Individual Defendants because they were not party to the arbitration agreement. The Court disagrees.

The Ninth Circuit recognizes that a non-signatory can enforce an arbitration agreement under the doctrine of equitable estoppel in two circumstances: "(1) when a signatory must rely on the terms of the written agreement in asserting its claims against the nonsignatory or the claims are intimately founded in and intertwined with the underlying contract," or "(2) when the signatory alleges substantially interdependent and concerted misconduct by the nonsignatory and another signatory and the allegations of interdependent misconduct [are] founded in or intimately connected with the obligations of the underlying agreement." *Kramer v. Toyota Motor Corp.*, 705 F.3d 1122, 1128–29 (9th Cir. 2013) (internal citations and quotation marks omitted). The key question in such cases is the degree to which the plaintiff's claims against the signatory are intertwined with the plaintiff's claims against the non-signatory. Where the claims against the signatory and non-signatory are intertwined, allowing the plaintiff to evade arbitration with the non-signatory would undermine the efficiency of arbitration and run the risk of duplicative decisions. *See Amisil Holdings Ltd. v. Clarium Capital Mgmt.*, 622 F. Supp. 2d 825, 840 (N.D. Cal. 2007) ("[W]here a lawsuit against non-signatories is inherently bound up with claims against a signatory, the court should compel arbitration in order to avoid denying the signatory the benefit of the arbitration clause, and in order to avoid duplicative litigation which undermines the efficiency of arbitration.").

The Court concludes that Plaintiffs are compelled to arbitrate their claims against each of the Defendants. This would be true under either "prong" of the Ninth Circuit's equitable estoppel test. Under the first prong, even if the Court were to allow Plaintiffs to proceed separately with their claims against Nebulous, Vorick, and Herbert, Plaintiffs would still need to "rely on the terms of the written agreement" in asserting those claims. *Kramer*, 705 F.3d at 1128. Determining whether the pre-order constituted a sale of securities in violation of state law, for example, will require a factfinder to wade through the Terms and Conditions of the pre-order. Second, all of Plaintiffs' claims allege "substantially interdependent and concerted misconduct" between the signatory Defendant, Obelisk, and the non-signatory Defendants. Indeed, other than control person liability asserted against Vorick and Herbert, Plaintiffs make no effort to differentiate the Defendants' actions. Plaintiffs refer to "Defendants" as a collective throughout the Complaint, arguing, for example, that "Defendants sold Mining Appliance Pre-orders to the general public through their website obelisk.tech;" "Defendants sold Pre-orders for Mining Appliances that were to be specially tailored to mine [cryptocurrency];" "Defendants failed to ship any Mining Appliances on time." Compl. at ¶¶ 62, 3-4. This lack of differentiation between Defendants is fatal to Plaintiff's argument. *See In re TFT-LCD (Flat Panel) Antitrust Litig.*, 2014 WL 1395733, at *4 (N.D. Cal. 2014) (compelling "arbitrat[ion] against all five NEC defendants . . . [where] the complaint often refers to the five defendants collectively as 'NEC.'"); *Victorio v. Sammy's Fishbox Realty Co., LLC*, 2015 WL 2152703, at *17 (S.D.N.Y. 2015) ("Where a plaintiff treats all defendants as a single unit in his complaint, it further supports estopping that plaintiff from shielding himself from arbitrating with certain defendants."). Without a reasonable basis for segregating Plaintiffs' allegations into arbitrable and non-arbitrable claims, all of Plaintiffs' claims against all of the Defendants must be arbitrated.

c.  **Whether to Stay or Dismiss the Action**

"A district court may either stay the action or dismiss it outright when, as here, the court determines that all of the claims raised in the action are subject to arbitration." *Johnmohammadi v. Bloomingdale's, Inc.*, 755 F.3d 1072, 1074 (9th Cir. 2014).

Notwithstanding this discretion, the Ninth Circuit's "preference" is for district courts to "stay[] an action pending arbitration rather than dismissing it." *MediVas, LLC v. Marubeni Corp.*, 741 F.3d 4, 9 (9th Cir. 2014). Neither party has expressed a preference regarding whether the Court should stay or dismiss the claims in the event it compels arbitration, so there's no reason to stray from the Ninth Circuit's preference. This action is **STAYED** pending the arbitration's resolution.

## CONCLUSION

For the reasons above, the Individual Defendants' Motion to Dismiss for Lack of Personal Jurisdiction is **DENIED**. Dkt. 9. The Individual Defendants' Motion to Dismiss for Failure to State a Claim is **DENIED AS MOOT**. Dkt. 9. The Corporate Defendants' Motion to Compel Arbitration is **GRANTED**, and the Individual Defendants' joinder in that Motion is likewise **GRANTED**. Dkts. 3, 9. This action is **STAYED**. The parties shall proceed immediately to arbitration and shall file a joint report regarding the status of the arbitration every **60 days** until the arbitration is complete. The first status report shall be filed no later than **June 28, 2019**.

IT IS SO ORDERED.

Dated: April 29, 2019

**HONORABLE LARRY ALAN BURNS**
Chief United States District Judge